[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11915
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 18, 2012
JOHN LEY
CLERK

D.C. Docket No. 2:10-cv-00106-JES-SPC

CONSERVANCY OF SOUTHWEST FLORIDA,
CENTER FOR BIOLOGICAL DIVERSITY,
PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,
COUNSEL OF CIVIC ASSOCIATIONS, INC.,

Plaintiffs - Appellants,

SIERRA CLUB,

Third Party Custodian - Appellant,

versus

U.S. FISH & WILDLIFE SERVICE,
DIRECTOR, U.S. FISH & WILDLIFE SERVICE,
DEPARTMENT OF INTERIOR,
SECRETARY OF THE DEPARTMENT OF INTERIOR,

Defendants - Appellees,

FLORIDA WILDLIFE FEDERATION, et al.,

Defendants,

SEMINOLE TRIBE OF FLORIDA,

                                                                    Intervenor Defendant - Appellee,

EASTERN COLLIER PROPERTY OWNERS,

                                                                                Movant - Appellee.


                                    _____

                            Appeal from the United States District Court
                               for the Middle District of Florida
                                    _____
                                          (April 18, 2012)

Before TJOFLAT, MARCUS and SILER,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

        This case concerns a challenge, brought under the Administrative Procedure

Act (the "APA"), 5 U.S.C. §§ 551–559, 701–706, to the United States Fish and

Wildlife Service's denial of petitions to designate critical habitat for the Florida

panther.  The Endangered Species Act of 1973 (the "ESA"), 16 U.S.C.

§§ 1531–1544, empowers the Secretary of the Interior to designate "critical

habitat" for species of fish, wildlife, or plants that have been identified by the

Secretary as "endangered" or "threatened."  Id. §§ 1532(5)(B), 1533(a)(3)(A).[1]

_____

        [*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting
by designation.

        [1] An "endangered species" is defined as "any species which is in danger of extinction
throughout all or a significant portion of its range," except for certain types of pests.  16 U.S.C.
§ 1532(6).  A "threatened species" is defined as "any species which is likely to become an
endangered species within the foreseeable future throughout all or a significant portion of its

                                                    2

The practical result of designating critical habitat is that federal agencies must then, in consultation with the Secretary, ensure not only that their actions are "not likely to jeopardize the continued existence" of such species, but also that they do not "result in the destruction or adverse modification" of critical habitat. Id. § 1536(a)(2).

In this case, environmental-advocacy groups petitioned the Fish and Wildlife Service, an agency within the Department of the Interior, to begin rulemaking to designate critical habitat for the Florida panther and, when the Service denied their petitions, sued in district court under the APA. They claimed that the denial of their petitions was arbitrary and capricious. See 5 U.S.C. § 706(2)(A). We conclude, however, that the denial of their petitions is not subject to judicial review under the APA because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Accordingly, we affirm the district court's order of dismissal.

range." Id. § 1532(20). "Critical habitat" means
> (i) the specific areas within the geographical area occupied by the species, at the time it is listed [as an endangered or threatened species] in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed [as an endangered or threatened species] in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

Id. § 1532(5)(A).

I.

A.

We begin with the necessary statutory background. In 1966, Congress enacted the Endangered Species Preservation Act (the "ESPA"), Pub. L. No. 89-669, 80 Stat. 926 (1966), the predecessor to the ESA. The ESPA authorized the Secretary of the Interior to list a species as endangered in the Federal Register after finding that "its existence is endangered because its habitat is threatened with destruction, drastic modification, or severe curtailment, or because of overexploitation, disease, predation, or because of other factors, and that its survival requires assistance." ESPA § 1(c), 80 Stat. at 926. The ESPA did not, however, require the Secretary to designate critical habitat for listed species. Nor did the original ESA, enacted in 1973.[2]

But in 1978, that changed. That year, Congress amended the ESA to require that "[a]t the time any such regulation [listing a species as endangered or

_____

[2] The ESPA contains no mention of critical habitat. And the original ESA's only mention of critical habitat is in a provision requiring federal agencies, "in consultation with and with the assistance of the Secretary," to ensure "that actions authorized, funded, or carried out by them do not jeopardize the continued existence of . . . endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical." Endangered Species Act of 1973, Pub. L. No. 93-205, § 7, 87 Stat. 884, 892. But the original ESA "provided no guidance on how or when [the Secretary] should determine a species' critical habitat." Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1264 (11th Cir. 2007).

4

threatened] is proposed, the Secretary shall also by regulation, to the maximum extent prudent, specify any habitat of such species which is then considered to be critical habitat." Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, § 11(1), 92 Stat. 3751, 3764. The 1978 amendments also provided, however, that this requirement "shall not apply with respect to any species which was listed prior to enactment of the [1978 amendments]." Id. As for those species, Congress instead allowed that "[c]ritical habitat may be established." Id. § 2(2), 92 Stat. at 3751 (emphasis added).[3]

The law now stands, in relevant part, essentially as the 1978 amendments left it, although further amendments in 1982 modified slightly the required timing of the critical-habitat designation.[4] Under current law, the Secretary generally

_____

[3] The full text of this provision reads as follows: "Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph." Endangered Species Act Amendments of 1978 § 2(2), 16 U.S.C. § 1532(5)(B). The cross-reference to subparagraph (A) refers to the statutory definition of "critical habitat." See id., 16 U.S.C. § 1532(5)(A).

[4] By 1982, some members of Congress had apparently grown frustrated that requiring the Secretary to propose both the listing of a species and the specification of its critical habitat at the same time had slowed the listing process. Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1265 (11th Cir. 2007). As a result, Congress replaced the timing requirement enacted in 1978 with a command that

> [t]he Secretary, by regulation promulgated in accordance with subsection (b) [which prescribes the appropriate bases for the Secretary's determinations] and to the maximum extent prudent and determinable—
> (A) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

must designate critical habitat "concurrently with making a determination . . . that a species is an endangered species or a threatened species." 16 U.S.C. § 1533(a)(3)(A)(i). But for species listed before the ESA required a concurrent critical-habitat designation, a different rule applies: "Critical habitat <u>may</u> be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established . . . ." <u>Id.</u> § 1532(5)(B) (emphasis added).

B.

In 1967—more than a decade before the 1978 amendments required a critical-habitat designation to accompany the listing of a species—the Secretary of the Interior listed the Florida panther as an endangered species. Endangered Species, 32 Fed. Reg. 4001 (Feb. 24, 1967) (codified at 50 C.F.R. § 17.11). No critical habitat for the Florida panther was designated at that time, and none has been designated since. Nor has the Secretary initiated rulemaking procedures to designate critical habitat for the Florida panther.

In 2009, environmental-advocacy groups, dissatisfied with this state of

---

(B) may, from time-to-time thereafter as appropriate, revise such designation.

Endangered Species Act Amendments of 1982, Pub. L. No. 97-304, § 2(a)(1)(E), 96 Stat. 1411, 1411. After this amendment, the Secretary had to designate critical habitat concurrently with the final decision to list a species, but was no longer required to propose critical habitat at the same time that listing was proposed. <u>Ala.-Tombigbee</u>, 477 F.3d at 1266.

6

affairs, petitioned the United States Fish and Wildlife Service (the "Service") to initiate rulemaking to designate critical habitat for the Florida panther.[5] The Conservancy of Southwest Florida (the "Conservancy") filed a petition on January 21. On July 23, other advocacy groups, including the Sierra Club, joined the Conservancy's petition. On September 17, the Center for Biological Diversity (the "Center"), Public Employees for Environmental Ethics ("PEER"), and the Council of Civic Associations (the "Council") filed another petition. And on November 19, the Sierra Club filed a supplemental petition.

The first two petitions cited scientific studies, including some relied on in the Service's own Florida Panther Recovery Plan,[6] detailing the decline of the

---

[5] The APA provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). And 50 C.F.R. § 424.14(a) provides that "[a]ny interested person may submit a written petition to the Secretary requesting that one of the actions described in § 424.10"—which include the designation of critical habitat—"be taken." 50 C.F.R. §§ 424.10, 424.14(a).

[6] The ESA requires the Secretary to develop recovery plans "for the conservation and survival of endangered species and threatened species." 16 U.S.C. § 1533(f)(1). Each recovery plan must include

　　　　(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
　　　　(ii) objective, measurable criteria which, when met, would result in a determination . . . that the species be removed from the list [of endangered or threatened species]; and
　　　　(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

Id. § 1533(f)(1)(B).

Florida panther population due to the gradual loss, degradation, and fragmentation of its habitat.[7] These petitions explained that because of their hunting, breeding, and other needs, panthers require broad home ranges—up to about 250 square miles for a male panther and 150 square miles for a female. In sum, the first two petitions presented evidence that dwindling habitat threatened the Florida panther's recovery and requested that the Service designate as critical habitat areas identified in one of the studies relied on by the Service in its Recovery Plan. The subsequent Sierra Club petition added evidence of the expected effect of climate change on the Florida panther's habitat. The Sierra Club petition further requested that the Service designate as critical habitat an additional area identified in another study.

The Service denied the petitions. On February 11, 2010, the Service explained its decision in three substantially identical letters to the Conservancy, the Center, and the Sierra Club. The letters briefly described other efforts that the Service was pursuing to protect the Florida panther's habitat. The letters explained that, in the Service's view, those efforts were sufficient in themselves, eliminating any need to designate critical habitat.

---

[7] Because we conclude that we may not review the Service's decision on these petitions, we need not detail the scientific evidence they set forth. It suffices to describe that evidence in general terms.

C.

On February 18, 2010, the groups that had petitioned the Service—the Conservancy, the Center, PEER, the Council, and the Sierra Club (collectively, "Plaintiffs")—filed suit in the United States District Court for the Middle District of Florida under the APA and the citizen-suit provisions of the ESA.[8]  The complaint named as defendants the Service, the Director of the Service in his official capacity, the United States Department of the Interior, and the Secretary of the Interior in his official capacity (collectively, "Federal Defendants").  Later the Seminole Tribe and Eastern Collier Property Owners (collectively, "Intervenor-Defendants"), an unincorporated association of companies that own, use, and develop land in the area that Plaintiffs seek to have designated as critical habitat, successfully moved to intervene as defendants under Federal Rule of Civil Procedure 24.

Plaintiffs alleged that the Service's denial of their rulemaking petitions was arbitrary and capricious under § 706(2)(A) of the APA.  They claimed that the Service had (1) made a decision contrary to the evidence before it, which allegedly

_____

[8]  The ESA's citizen-suit provisions allow that "any person may commence a civil suit on his own behalf . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary."  16 U.S.C. § 1540(g)(1)(C).  On appeal, however, Plaintiffs have expressly abandoned any claims for relief under the ESA's citizen-suit provisions; they press only their APA claims.  We limit our discussion accordingly.

9

demonstrated the need for critical habitat; (2) overlooked the expected impact of climate change on the Florida panther's habitat; and (3) in listing other efforts being taken to preserve panther habitat, rather than directly addressing the science discussed in the petitions, failed to provide a rational explanation for its decision.[9] Plaintiffs also alleged that the Service had failed to comply with 50 C.F.R. § 424.12(b), which, according to Plaintiffs, required the Service to consider specified factors in responding to their petitions.[10] Plaintiffs also alleged that the Service had failed to comply with 16 U.S.C. § 1533(b)(2) and 50 C.F.R. § 424.12(a), which, they claimed, required the Service to respond to their petitions "on the basis of the best scientific data available." 16 U.S.C. § 1533(b)(2); 50 C.F.R. § 424.12(a).[11] Plaintiffs sought a declaratory judgment that the Service's denial of their petitions was unlawful and an order vacating that denial and

---

[9] The APA's arbitrary-and-capricious standard requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2866, 77 L. Ed. 2d 443 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S. Ct. 239, 246, 9 L. Ed. 2d 207 (1962)) (internal quotation marks omitted). Agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem" or has "offered an explanation for its decision that runs counter to the evidence before the agency." Id., 103 S. Ct. at 2867.

[10] An agency's failure to follow its own regulations is arbitrary and capricious. Simmons v. Block, 782 F.2d 1545, 1550 (11th Cir. 1986).

[11] The regulations and statutory provisions cited by Plaintiffs, as well as their applicability—or, rather, inapplicability—to this case, are discussed further in part II.A, infra.

10

remanding the matter to the Service.[12]

Federal Defendants and Intervenor-Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (b)(6), arguing that Plaintiffs lacked standing under Article III of the United States Constitution; that APA review was unavailable because the Service's decision was "committed to agency discretion by law," 5 U.S.C. § 701(a)(2); and that even if review were available, Plaintiffs' claims failed on the merits. The district court concluded that Plaintiffs had adequately alleged Article III standing. It also concluded, however, that none of the regulations or statutory provisions that Plaintiffs insisted the Service had violated applied to the decision whether to designate critical habitat for the Florida panther. In the absence of any standards to limit the Service's discretion, the district court concluded that the Service's denial of Plaintiffs' petitions was committed to agency discretion by law and therefore could not be reviewed under the APA. Accordingly, the court granted the motions to dismiss.[13] Plaintiffs now appeal, arguing that the district court erred in concluding that APA review was

---

[12] Plaintiffs also sought an injunction requiring Federal Defendants to initiate rulemaking to designate critical habitat for the Florida panther. On appeal, however, they have expressly abandoned any claim of entitlement to such relief.

[13] The lack of standards limiting the Service's discretion also led the district court to conclude that the denial of Plaintiffs' petitions was not a nondiscretionary action that could be challenged under the ESA's citizen-suit provisions. See 16 U.S.C. § 1540(g)(1)(C).

11

unavailable.

II.

The APA authorizes federal courts to set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA provisions subjecting agency action to judicial review are inapplicable, however, "to the extent that . . . agency action is committed to agency discretion by law." Id. § 701(a)(2). Section 701(a)(2), as interpreted by the Supreme Court, precludes APA review wherever the statute under which the agency acts "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—that is, where a court would have "no law to apply." Heckler v. Chaney, 470 U.S. 821, 830, 105 S. Ct. 1649, 1655, 84 L. Ed. 2d 714 (1985) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S. Ct. 814, 821, 28 L. Ed. 2d 136 (1971)) (internal quotation marks omitted).

Plaintiffs argue that several regulations and statutory provisions govern the Service's decision whether to designate critical habitat for species listed as endangered or threatened before the 1978 ESA amendments and thus provide law to apply in this case. We first address this argument. We conclude that these provisions do not, in fact, apply in this case. We then explain why, in light of that

12

fact, we must conclude that the decision challenged here is not subject to APA review. We hold that the Service's decision not to initiate rulemaking to designate critical habitat for species listed before the 1978 amendments is committed to agency discretion by law.

A.

1.

Plaintiffs point to 50 C.F.R. § 424.14(d), which provides in pertinent part, "Upon receiving a petition to designate critical habitat . . . , the Secretary shall promptly conduct a review in accordance with the [APA] (5 U.S.C. 553) and applicable Departmental regulations, and take appropriate action." 50 C.F.R. § 424.14(d). According to Plaintiffs, "applicable Departmental regulations" include the provisions of 50 C.F.R. § 424.12(b). Section 424.12(b) provides in full:

> In determining what areas are critical habitat, the Secretary shall consider those physical and biological features that are essential to the conservation of a given species and that may require special management considerations or protection. Such requirements include, but are not limited to the following:
> (1) Space for individual and population growth, and for normal behavior;
> (2) Food, water, air, light, minerals, or other nutritional or physiological requirements;
> (3) Cover or shelter;
> (4) Sites for breeding, reproduction, rearing of offspring,

13

germination, or seed dispersal; and generally[,]

>            (5) Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.
> When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species.  Known primary constituent elements shall be listed with the critical habitat description.  Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

Id. § 424.12(b).  Plaintiffs argue that the factors specified in this regulation provide ample standards for judicial review.

Context shows, however, that § 424.12(b) does not apply to the decision whether to designate critical habitat for a species listed before the 1978 amendments.  The first sentence of § 424.12 provides that "[c]ritical habitat shall be specified to the maximum extent prudent and determinable at the time a species is proposed for listing."  Id. § 424.12(a).  This provision embodies the requirement created by the 1978 amendments and modified by the 1982 amendments—that critical habitat must be designated concurrently with the listing of a species—and thus cannot apply to any pre-1978 species, like the Florida panther, that has already been listed without a concurrent designation of critical habitat.  That § 424.12 opens with this sentence suggests that the entire section is not intended to

14

apply to the designation of critical habitat for pre-1978 species.

This conclusion is further supported by examination of subsection (b) itself. According to Plaintiffs, the phrases "In determining what areas are critical habitat" and "When considering the designation of critical habitat" suggest that § 424.12(b) applies to the Secretary's initial decision whether to designate critical habitat at all. Id. § 424.12(b). But the factors listed in subsection (b) make sense only if it is presupposed that some area will be designated as critical habitat, leaving only the question of "what areas are critical habitat." Id. (emphasis added). If the question is which areas should be designated as critical habitat, it makes sense to choose an area with "[s]pace for individual and population growth"; "[f]ood, water, [and] air"; and "[s]ites for breeding, reproduction, [and] rearing of offspring." Id. § 424.12(b)(1)–(2), (4). But these factors are poorly suited to guide the antecedent decision whether to designate critical habitat at all. Endangered species will always need space for growth, food and water, sites for breeding, and so on. Such factors thus do little to distinguish cases in which the designation of critical habitat is warranted from those in which it is not. These regulations, therefore, are best read not to apply to the decision whether to designate critical habitat for a pre-1978 species. Thus, they do not limit the Service's discretion in this case.

15

Plaintiffs also rely heavily on 50 C.F.R. § 424.12(a). Section 424.12(a) provides that "[a] final designation of critical habitat shall be made on the basis of the best scientific data available, after taking into consideration the probable economic and other impacts of making such a designation in accordance with § 424.19." Id. § 424.12(a). Section 424.19 provides in full:

> The Secretary shall identify any significant activities that would either affect an area considered for designation as critical habitat or be likely to be affected by the designation, and shall, after proposing designation of such an area, consider the probable economic and other impacts of the designation upon proposed or ongoing activities. The Secretary may exclude any portion of such an area from the critical habitat if the benefits of such exclusion outweigh the benefits of specifying the area as part of the critical habitat. The Secretary shall not exclude any such area if, based on the best scientific and commercial data available, he determines that the failure to designate that area as critical habitat will result in the extinction of the species concerned.

Id. § 424.19.

Similar remarks apply to these regulations. As noted above, § 424.12 begins by providing that critical habitat must be specified when a species is proposed for listing, suggesting that that section does not apply to species listed before the 1978 amendments. See id. § 424.12(a). And § 424.12(a)'s requirement that the Secretary consult "the best scientific data available" expressly applies only to "[a] final designation of critical habitat," not to the Secretary's consideration of

16

a petition for such a designation.  Id.

Section 424.19 is no more helpful to Plaintiffs.  That section, like § 424.12(b), presupposes that some area will be designated as critical habitat. Provisions allowing the Secretary to "exclude" certain areas from the critical habitat evidently take it for granted that some area will be designated.  Id. § 424.19.  And the requirement that the Secretary consider the "economic and other impacts" of designating critical habitat applies only "after [the Secretary has] propos[ed] designation of such an area," which did not happen in this case.  Id. None of these regulations, therefore, governs the Secretary's initial decision whether to commence rulemaking to designate critical habitat for a pre-1978 species.

2.

Plaintiffs also argue that the Service's decision was subject to 16 U.S.C. § 1533(b)(2).  Section 1533(b)(2) requires the Secretary to "designate critical habitat, and make revisions thereto, under subsection (a)(3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).

But this provision does not apply to the decision whether to initiate

17

rulemaking to designate critical habitat for species, like the Florida panther, that were listed before the 1978 amendments. Subsection (a)(3) provides that the Secretary "shall, <u>concurrently with making a determination . . . that a species is an endangered species or a threatened species</u>, designate any habitat of such species which is then considered to be critical habitat." <u>Id.</u> § 1533(a)(3)(A)(i) (emphasis added). Thus, the provision Plaintiffs rely on cannot apply to designations of critical habitat for species listed before the 1978 amendments without a concurrent designation of critical habitat, because for those species, the Secretary does not "designate critical habitat . . . <u>under subsection (a)(3)</u>" of § 1533. <u>Id.</u> § 1533(b)(2) (emphasis added). For those species, the Secretary designates critical habitat, if at all, under § 1532(5)(B).

Plaintiffs argue that an uncodified provision of the 1982 amendments to the ESA makes § 1533(b)(2)'s standards applicable to their petitions. The provision they cite reads as follows:

> Any regulation proposed after, or pending on, the date of the enactment of this Act to designate critical habitat for a species that was determined before such date of enactment to be endangered or threatened shall be subject to the procedures set forth in section 4 of [the ESA (codified at 16 U.S.C. § 1533)] . . . for regulations proposing revisions to critical habitat instead of those for regulations proposing the designation of critical habitat.

Endangered Species Act Amendments of 1982, Pub. L. No. 97-304, § 2(b)(2), 96

18

Stat. 1411, 1416. Plaintiffs' argument, in effect, is that their petition to designate critical habitat for the Florida panther is a "regulation proposed after . . . the date of the enactment" of the 1982 amendments and therefore "subject to the procedures set forth" in 16 U.S.C. § 1533. Id. These procedures, Plaintiffs argue, include the "best scientific data" requirement discussed above, as well as § 1533(b)(3)(D)(i)'s requirement that "within 90 days after receiving [a] petition . . . to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted." 16 U.S.C. § 1533(b)(3)(D)(i).

The uncodified 1982 provision might change our answer to the question whether statutory standards govern the Service's discretion in this case if the Service had proposed a regulation designating critical habitat for the Florida panther. But the uncodified provision does not apply in this case because a regulation proposed only in a petition for rulemaking, and not by the Secretary, is not a "regulation proposed" within the meaning of the statute. Apart from the provision Plaintiffs rely on, the statute uses variants of the phrase "proposed regulation" several times. Each time, the phrase refers to a regulation proposed <u>by the Secretary</u>, not one proposed in a rulemaking petition submitted to the Secretary. <u>See, e.g.</u>, Endangered Species Act Amendments of 1982 § 2(a)(2), 96

19

Stat. at 1412 (codified at 16 U.S.C. § 1533(b)(3)(B)(ii)) ("[T]he Secretary shall promptly publish in the Federal Register a general notice and the complete text of a _proposed regulation_ . . . ." (emphasis added)); id., 96 Stat. at 1415 (codified at 16 U.S.C. § 1533(b)(8)) ("The publication in the Federal Register of any _proposed or final regulation_ which is necessary or appropriate to carry out the purposes of this Act shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation . . . ." (emphasis added)). There is no reason to give the phrase a different meaning here.

We conclude, accordingly, that the uncodified 1982 provision does not apply to Plaintiffs' petitions to designate critical habitat. That provision thus does not change the fact that the ESA provides no standards against which to review the initial decision whether to designate critical habitat for a species listed before the 1978 amendments.[14]

---

[14] Plaintiffs also argue that the ESA's definition of "critical habitat" provides law to apply. That definition is as follows:

> The term "critical habitat" for a threatened or endangered species means—
> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

B.

Neither the ESA nor the regulations cited by Plaintiffs provide any "meaningful standard"—or, indeed, any standard—"against which to judge the agency's exercise of discretion" in this case. Heckler, 470 U.S. at 830, 105 S. Ct. at 1655. We conclude, therefore, that the decision challenged here is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

We have held before that the absence of any applicable legal standard that limits the agency's discretion precludes APA review. See Greenwood Utils. Comm'n v. Hodel, 764 F.2d 1459, 1464 (11th Cir. 1985) ("Only if a specific statute somehow limits the agency's discretion to act is there sufficient 'law to apply' as to allow judicial review."). In Lenis v. United States Attorney General, 525 F.3d 1291 (11th Cir. 2008), we held that the Board of Immigration Appeals' decision whether to reopen a case sua sponte was committed to agency discretion by law because neither any statute nor any regulation provided any standard that limited the Board's discretion. Id. at 1293–94. And in Haitian Refugee Center, Inc. v. Baker, 953 F.2d 1498 (11th Cir. 1992) (per curiam), we held that the Immigration and Naturalization Service's procedures for identifying refugees were

We are unpersuaded. This provision offers nothing that could guide the threshold decision whether to designate critical habitat. It could guide the decision of which areas to designate as critical habitat, once the decision to designate some area has been made. It does not, however, provide law to apply in this case.

21

not subject to APA review because no statute, executive order, regulation, or treaty provided any standards that constrained the agency's discretion in determining who qualified as a refugee. Id. at 1507–08. Although those cases involved contexts different from this case, and therefore cannot be considered directly controlling, they support our conclusion that § 701(a)(2) applies here as well.[15]

---

[15] Plaintiffs cite a number of cases from other circuits, or from district courts, that they insist establish the availability of judicial review. But none of these cases holds that 5 U.S.C. § 701(a)(2) does not preclude APA review of the denial of a petition to designate critical habitat for a species listed before the 1978 amendments. Nor do they persuade us that we should adopt such a holding.

Plaintiffs point out that one district court has reviewed the denial of a petition to designate critical habitat for a pre-1978 species. Fund for Animals v. Babbitt, 903 F. Supp. 96, 115–17 (D.D.C. 1995). But that court did so without explaining—or even stating—its apparent assumption that that decision was not committed to agency discretion by law. See id. We decline to adopt that unexplained assumption.

The Ninth Circuit has reviewed the Service's decision not to designate critical habitat for a pre-1978 species—a decision made after the Service had already initiated the rulemaking process—over the objection that § 701(a)(2) precluded APA review. Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 936–38 (9th Cir. 2006). But there, statutory standards limited the Service's discretion. Because a proposed regulation to designate critical habitat—one proposed by the Service—had been pending when the 1982 amendments were enacted, id. at 933, the uncodified 1982 provision discussed above applied, see id. at 935 (relying on the uncodified provision of the 1982 amendments to conclude that "critical habitat designations for the [species at issue]—listed as an endangered species in 1970—are governed by the procedures for critical habitat revisions" (footnote omitted)). As a result, the Service's discretion was subject to statutory limits. See id. at 936–37 (explaining that "[o]nce a critical habitat revision proposal [was] published, the Service ha[d] one year in which" to take "one of four actions" specified by 16 U.S.C. § 1533(b)(6)(A)(i)). In this case, by contrast, no such limits apply.

Other courts have reviewed other agency decisions made under the ESA, though, again, sometimes without explicitly addressing whether § 701(a)(2) precluded review. In Defenders of Wildlife v. Gutierrez, 532 F.3d 913 (D.C. Cir. 2008), the D.C. Circuit—without addressing the § 701(a)(2) issue—reviewed the denial of a petition for emergency rulemaking to regulate the speed of ships near whale habitats. Id. at 918–21. But even if the court had addressed the

Our conclusion is also bolstered by the permissive language of the statutory provision authorizing the Secretary to designate critical habitat for species listed before the 1978 amendments: "Critical habitat <u>may</u> be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph." 16 U.S.C. § 1532(5)(B) (emphasis added); <u>cf.</u> <u>Webster v. Doe</u>, 486 U.S. 592, 600, 108 S. Ct. 2047, 2052, 100 L. Ed. 2d 632 (1988) (holding that the CIA Director's decision to fire an employee was committed to agency discretion in part because the relevant statute authorized firing "whenever the Director 'shall <u>deem</u> such termination necessary or advisable in the interests of the United States'" (quoting National Security Act of 1947, Pub. L. No. 80-235, § 102(c), 61 Stat. 495, 498); <u>Fla. Dep't of Bus. Regulation v. U.S. Dep't of the Interior</u>, 768 F.2d 1248, 1256 (11th Cir. 1985) (emphasizing that "[t]he statute states that the decision to acquire land is one within the Secretary's discretion"). Plaintiffs argue

_____

§ 701(a)(2) issue, the decision at issue in that case was far from identical to the one challenged here, where neither the ESA nor any regulation provides standards for judicial review. In <u>Sierra Club v. Glickman</u>, 156 F.3d 606 (5th Cir. 1998), the Fifth Circuit held that § 701(a)(2) did not preclude review of an agency's failure to follow 16 U.S.C. § 1536(a)(1)'s "clear statutory directive (it uses the word 'shall') requiring the federal agencies to consult and develop programs for the conservation of each of the endangered and threatened species listed pursuant to the [ESA]." <u>Id.</u> at 617. In this case, however, there is no such "clear statutory directive," unless we are to count the permissive language providing that "[c]ritical habitat <u>may</u> be established"—language whose permissive character is not qualified by any other statutory limit on the Service's discretion. 16 U.S.C. § 1532(5)(B).

that the word "may" should not be read "in isolation." Appellants' Br. 51. But we do no such thing. Instead, we observe that in context—against the backdrop of a statutory and regulatory regime that provides absolutely no standards that constrain the Service's discretion—the statute's permissive language makes it all the more apparent that the decision at issue is committed to agency discretion.[16]

We also note that courts often consider the nature of the challenged decision and its suitability for judicial review in determining whether it is committed to agency discretion. In Florida Department of Business Regulation, we held the Secretary's decision to be committed to agency discretion in part because it "involve[d] a myriad of factors, including internal management constraints relating to budget limits, the particular needs of the numerous individual Indians

---

[16] The case Plaintiffs cite in support of this argument does nothing to strengthen it. In Amador County v. Salazar, 640 F.3d 373 (D.C. Cir. 2011), the D.C. Circuit chided an agency for arguing that Congress's use of the word "may" showed that the challenged decision was committed to agency discretion. Id. at 380–81. However, the statute at issue in that case provided that the agency "may disapprove a compact . . . only if such compact violates—(i) any provision of this chapter, (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians." Id. (alterations in original) (second emphasis added) (quoting 25 U.S.C. § 2710(d)(8)(B)) (internal quotation marks omitted).

That case is unlike this one. In Amador County, an "only if" clause limited the agency's options, allowing action only under specified conditions. See id. at 381 ("[S]ubsection (d)(8)(B)'s use of 'may' is best read to limit the circumstances in which disapproval is allowed."). But in this case, in stark contrast, the permission granted by the word "may" is unqualified. Plaintiffs argue that the clause "as set forth in subparagraph (A) of this paragraph" qualifies the permission granted by the word "may." 16 U.S.C. § 1532(5)(B). But we have already explained why subparagraph (A) does not limit the Service's discretion in making the initial decision whether to designate critical habitat. See supra note 14.

and Indian tribes, the proposed use of the land, and government resources for overseeing the land." 768 F.2d at 1256. And in Heckler, the Supreme Court relied on "the general unsuitability for judicial review of agency decisions to refuse enforcement" to justify a presumption that such decisions are committed to agency discretion by law. 470 U.S. at 831, 105 S. Ct. at 1655.

In this case, similarly, our conclusion finds support in the fact that the challenged agency decision is a refusal to initiate rulemaking. As the D.C. Circuit has explained, a denial of a petition for rulemaking shares some, though not all, of the features that justify the presumption that an agency's decision not to take enforcement action is committed to its discretion. See Am. Horse Prot. Ass'n v. Lyng, 812 F.2d 1, 4 (D.C. Cir. 1987) ("[Heckler's] reasoning applies to some extent to a refusal to institute a rulemaking."). The decision whether to initiate rulemaking, like the exercise of enforcement discretion, typically involves a complex balancing of factors, such as the agency's priorities and the availability of resources, that the agency is better equipped than courts to undertake. See id. ("[S]uch decisions require a high level of agency expertise and coordination in setting priorities."); cf. Heckler, 470 U.S. at 831–32, 105 S. Ct. at 1656 ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."). And a refusal to initiate

25

rulemaking, like a nonenforcement decision, does not involve the exercise of "'coercive power over an individual's liberty or property rights.'" Am. Horse Prot. Ass'n, 812 F.2d at 4 (quoting Heckler, 470 U.S. at 832, 105 S. Ct. at 1656).

We do not suggest that the denial of a petition for rulemaking is always unreviewable, or even presumptively unreviewable. Such a notion would be contrary to precedent. See Massachusetts v. EPA, 549 U.S. 497, 527–28, 127 S. Ct. 1438, 1459, 167 L. Ed. 2d 248 (2007) (concluding that "[r]efusals to promulgate rules are . . . susceptible to judicial review, though such review is extremely limited and highly deferential," before going on to review the EPA's denial of a rulemaking petition requesting the regulation of greenhouse gas emissions from motor vehicles (internal quotation marks omitted)). But the features that such a decision shares with nonenforcement decisions further support our conclusion that, given the absence of any applicable statutory or regulatory standards, the Service's decision not to initiate rulemaking to designate critical habitat for a pre-1978 species is committed to agency discretion by law.

We take care to note that not every agency action that is in some sense discretionary is exempt from APA review. Otherwise there would be little sense in the APA's provision for abuse of discretion review. See Heckler, 470 U.S. at 829, 105 S. Ct. at 1654 (pointing out the tension, noted by some commentators,

26

between a too-literal reading of the statutory phrase "committed to agency discretion by law" and 5 U.S.C. § 706(2)(A)'s provision for review for abuse of discretion). Rulemaking inevitably requires the exercise of discretion, but courts nevertheless review agency rulemaking under the APA. See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 46, 51, 103 S. Ct. 2856, 2868, 2871, 77 L. Ed. 2d 443 (1983) (holding that the National Highway Traffic Safety Administration had acted arbitrarily and capriciously when it issued a rule rescinding a requirement that all cars be manufactured with passive restraints because the agency "apparently gave no consideration whatever to modifying the Standard to require that airbag technology be utilized" and "was too quick to dismiss the safety benefits of automatic seatbelts"). Even an agency's denial of a petition for rulemaking may often be reviewable. See Massachusetts v. EPA, 549 U.S. at 527–28, 127 S. Ct. at 1459. Cases in which § 701(a)(2) precludes APA review are thus uncommon. See, e.g., Overton Park, 401 U.S. at 410, 91 S. Ct. at 820–21 (characterizing § 701(a)(2) as a "very narrow exception" applicable only in "rare instances"); Haitian Refugee Ctr., 953 F.2d at 1507 (characterizing § 701(a)(2) as a "very narrow" exception).[17] This, however, is

---

[17] It is worth noting, however, that despite the oft-repeated dictum that unreviewability is rare, for certain types of agency decisions, it is in fact the norm. See Heckler, 470 U.S. at 832, 105 S. Ct. at 1656 ("[A]n agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)."); see also ICC v. Bhd. of Locomotive Eng'rs,

such a case.

### III.

For the foregoing reasons, we conclude that the APA does not authorize judicial review of the Service's denial of Plaintiffs' petitions to initiate rulemaking to designate critical habitat for the Florida panther. Accordingly, the judgment of the district court is

AFFIRMED.

---

482 U.S. 270, 282, 107 S. Ct. 2360, 2367–68, 96 L. Ed. 2d 222 (1987) (suggesting that § 701(a)(2) "was meant to preserve" a "tradition of nonreviewability [that] exists with regard to refusals to reconsider for material error [in the original decision, rather than for new evidence or for changed circumstances arising after the original decision], by agencies as by lower courts").