[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12046

Non-Argument Calendar

_____

FLORIDA DEFENDERS OF THE ENVIRONMENT,
a Florida not-for-profit Corporation,
BRUCE KASTER,
JOSEPH LITTLE,

Plaintiffs-Appellants,

*versus*

UNITED STATES FOREST SERVICE,

Defendant-Appellee.

———————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:17-cv-01128-HES-JBT

———————————

Before JORDAN, ROSENBAUM, and GRANT, Circuit Judges.

PER CURIAM:

Acting to prevent "permanent damage" to the "uniquely beautiful" Ocklawaha River, President Nixon canceled the Cross Florida Barge Canal (Canal) in 1971 in response to litigation and advocacy by environmental groups like Plaintiff Florida Defenders of the Environment. While the river was spared from further damage, it still took a significant blow. By the time President Nixon made his decision, nearly one third of the ambitious federal project to create an inland shipping canal across northern Florida was complete. Among the completed structures, the Rodman Dam, now the Kirkpatrick Dam, dammed the Ocklawaha River and flooded approximately 9,000 acres of forest to create the Rodman Reservoir. This lawsuit is a piece of a long-running campaign to remove the dam and reservoir and restore the Ocklawaha River.

The State of Florida currently operates and maintains the dam and reservoir, having been transferred nearly all the federal government's Canal-related land and structures in 1991. But portions of the dam and reservoir occupy Ocala National Forest land managed by the U.S. Forest Service, requiring the state to obtain a

special-use permit to use and occupy the land.  The state's permit expired in 2002, though, when it declined to sign a new permit that would have required partial restoration of the Ocklawaha River. And on several occasions since then, the state has refused to sign a permit conditioning its use of national forest land on partial river restoration.

In 2017, Florida Defenders of the Environment and two of its senior members, Bruce Kaster and Joseph Little (collectively, "FDE"), filed a lawsuit under the Administrative Procedure Act ("APA"), see 5 U.S.C. § 706, seeking to compel the Forest Service to "assert its sovereign interest" in the national forest land at issue and take action to protect and restore the Ocklawaha River.  They alleged that the Forest Service had abused its discretion and acted contrary to law by permitting the state's unauthorized use and occupancy of the Canal structures on national forest land.  And they sought to compel the Forest Service either to require the state to remove the Canal structures and restore the land or to take such action on its own.

The district court determined that it lacked subject-matter jurisdiction to review the Forest Service's decision not to take enforcement action against the state because it was "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  On appeal, Defenders maintain that review is possible because there are meaningful standards by which to judge the agency's exercise of discretion.  But the refusal to take enforcement action is traditionally committed to agency discretion by law, and FDE fails to identify any statutory or regulatory constraints on the agency's discretion

to handle expired or unauthorized uses of national forest land.  We therefore affirm the dismissal of FDE's complaint, although we vacate to allow the district court to reenter its judgment without prejudice.

## I.

Florida Defenders of the Environment is a non-profit environmental organization formed in 1969 to protect the Ocklawaha River from environmental damage caused by the Canal.[1]  FDE has continued to focus efforts on restoring damage the defunct Canal caused to the Ocklawaha River.  Kaster is a lawyer and member of FDE's Board of Trustees, and he frequently recreationally visits the lands at issue.  Little is a law professor and FDE's Vice President.

Authorized by Congress in 1942, the Canal was conceived as a 107-mile navigable shortcut linking the Gulf of Mexico and the Atlantic Ocean through the northern part of the Florida peninsula.  Congress eventually approved funds for the project in the 1960s.  The U.S. Army Corps of Engineers ("Corps") began construction on the Canal and, as relevant here, finished construction of the Rodman Dam, now the Kirkpatrick Dam, in 1968.  Nearby, the Corps also constructed the Eureka Lock and Dam (Eureka Lock).  The Kirkpatrick Dam impounded the Ocklawaha River and

---

[1] We take the following facts from both FDE's complaint and the administrative record filed by the Forest Service, which may be accessed online on the Forest Service's website. *See* U.S. Department of Agriculture, Forest Service, *National Forests in Florida — 2017 Rodman Dam Litigation*, https://www.fs.usda.gov/detail/florida/landmanagement/?cid=FSEPRD584834 (last visited August 6, 2021).

created the Rodman Reservoir, flooding approximately 9,000 acres of forest, including approximately 670 acres of national forest land. Portions of Kirkpatrick Dam, Rodman Reservoir, and Eureka Lock (the Canal structures) are located in the Ocala National Forest.

In 1971, when about one third of the Canal had been built, President Nixon ordered "a halt to further construction of the [Canal] to prevent potentially serious environmental damages." *United States v. 2,997.06 Acres of Land*, 471 F.2d 320, 325 n.8 (5th Cir. 1972) (quoting President Nixon's statement suspending construction of the Canal). In particular, President Nixon cited the environmental damage to and potential destruction of the Ocklawaha River, a "uniquely beautiful, semitropical stream, one of a very few of its kind in the United States." *Id.* Congress officially deauthorized the Canal in 1990, and the Corps transferred its land interests and structures in the Canal to the State of Florida in 1991, including the Canal structures. The Canal has since been transformed into the Marjorie Harris Carr Cross Florida Greenway, a public conservation and recreation area named for the FDE's co-founder who led opposition to the Canal.

The Forest Service, however, retained its land interests, requiring the state to obtain a permit to use and occupy the Canal structures on national forest land. Such a permit is a "special use authorization which provides permission, without conveying an interest in land, to occupy and use National Forest System land or facilities for specified purposes, and which is both revocable and terminable." 36 C.F.R. § 251.51.

In 1994, the state, acting through the Florida Department of Environmental Protection, applied for and obtained a special-use permit, which was set to expire at the end of 1998. The state applied to renew the permit before it expired, and the Forest Service extended the original permit pending a final decision on the renewal application.

At that time, both parties shared the goal of removing the Kirkpatrick Dam and Rodman Reservoir in whole or part and restoring the Ocklawaha River. The state's renewal application sought authorization to operate and maintain the dam and reservoir "until implementation of the Governor and Cabinet's decision to partially restore the Oklawaha River through breaching Kirkpatrick Dam."

The Forest Service prepared an environmental impact statement regarding the state's continued use and occupancy and then approved a new special-use permit on the express condition that the state begin to partially restore the Ocklawaha River basin. According to the Forest Service's December 2001 Record of Decision, the partial restoration plan included lowering the water level in the Rodman Reservoir, breaching the Kirkpatrick Dam, removing some infrastructure, and altering some topography. The Record of Decision stated that the state's failure to make "progress . . . in the restoration effort based on the proposed schedule in the Special Use Permit" would be grounds for revocation of the permit. All work was to be done by 2006.

The state declined to sign the renewal permit in 2002, citing the lack of funding for the partial restoration plan but affirming the

state's commitment to removing the Kirkpatrick Dam and restoring the Ocklawaha River. As a result, the original special-use permit expired in 2002.

In March 2010, the Forest Service issued a new special-use permit to the state with the same conditions, but the state declined to sign it. Around three years later, in February 2013, the Forest Service again submitted to the state a special-use permit together with a letter noting that it was required to have "an authorization for occupancy," that the prior permit had expired, and that termination or expiration of the permit required the permitholder to remove structures and improvements or be liable for the cost of such removal. The letter further noted that fluctuating water levels at the reservoir were continuing to damage Forest Service land and resources and were making it "more difficult to restore the Ocklawaha River and its associated habitats as agreed to by the State of Florida and expected of the [Forest Service] and the State by the public." The state did not execute the permit, and it continues to operate the Canal structures on national forest land without authorization.

In December 2016, Kaster and Little petitioned the Forest Service under 5 U.S.C. § 553(e) to issue and implement rules to enforce the terms of the original special-use permit and to redress the continuing failure of the Forest Service to manage its land in a manner consistent with the Forest Plan for national forests in Florida.

The Forest Service denied the petition in March 2017 in part on the ground that the state could continue to use and occupy national forest lands under the original permit, which was "still in

effect." It later revised its decision in June 2018, after FDE filed this lawsuit, omitting that rationale and opining that rulemaking was not an appropriate vehicle to enforce the terms of a special-use permit, that the petitioners could not force the Forest Service to prioritize enforcing one particular use over other enforcement priorities, and that the Forest Service's actions did not conflict with the current Forest Plan.

## II.

In October 2017, FDE sued the Forest Service in federal district court under the APA, *see* 5 U.S.C. § 701 *et seq.*, seeking to compel it to enforce the terms of the Record of Decision and the original special-use permit. Count I sought declaratory relief that the Forest Service violated the Federal Land Policy and Management Act ("FLPMA") by allowing the Canal structures to occupy federal lands without a valid special-use permit, as well as an injunction requiring the state, a nonparty, to apply for a new permit. Count II sought declaratory relief that the original special-use permit had expired and that the Forest Service's denial of the rulemaking petition was arbitrary and capricious. Counts III and IV sought a declaration that the Forest Service's "failure to enforce" the terms and conditions of the special-use permit (Count III) and the pertinent regulations (Count IV) were actions "unlawfully withheld" or "unreasonably delayed" under the APA. Finally, Count V sought an injunction directing the Forest Service to enforce the original permit's terms and the pertinent regulations.

The Forest Service filed a motion to dismiss on the grounds that (1) the APA did not authorize judicial review because

enforcement decisions in relation to special-use permits were committed to agency discretion under 5 U.S.C. § 701(a)(2); (2) Counts III and IV sought action from the Forest Service that was not legally required and thus could not be compelled under 5 U.S.C. § 706; (3) all of the claims were time-barred; and (4) Count II was mooted by the Forest Service's revised June 2018 response to the petition.

The district court granted the Forest Service's motion and dismissed the action with prejudice. The court held that it lacked subject-matter jurisdiction because the Forest Service's decision not to take enforcement action was "committed to agency discretion by law" under § 701(a)(2) and therefore not judicially reviewable. The court then denied FDE's motion to alter or amend the judgment, and FDE timely appealed.

## III.

Whether an agency action is barred from judicial review under 5 U.S.C. § 701(a)(2) presents a question of subject-matter jurisdiction that we review *de novo*. *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015).

## A.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Under the APA, federal courts may "set aside agency actions found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1078 (11th Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)). The statute also allows federal

courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

The APA establishes a basic presumption of judicial review of agency action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. ___, 140 S. Ct. 1891, 1905 (2020). That presumption can be rebutted by showing, as relevant here, that the "agency action is committed to agency discretion by law." *Id.* (quoting 5 U.S.C. § 701(a)(2)).

The Supreme Court has "read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). One such category is "an agency's decision not to take enforcement action." *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985).

"[A] constellation of reasons underpin this tradition." *Regents*, 140 S. Ct. at 1906. An agency decision not to enforce typically "involves a complicated balancing of a number of factors which are peculiarly within its expertise," such the proper distribution of limited agency resources and "ordering of its priorities." *Heckler*, 470 U.S. at 830–31. And non-enforcement generally does not involve an agency's "coercive power over an individual's liberty or property rights." *Id.* at 832. Nor does it involve any action that "provides a focus for judicial review." *Id.* An agency's decision not to enforce also shares some characteristics with a prosecutor's decision not to indict, "a decision which has long been regarded as the special province of the Executive Branch." *Id.* These concerns animated the Court's conclusion that "an agency's decision not to

take enforcement action should be presumed immune from judicial review under § 701(a)(2)." *Id.*

Relying on similar concerns, we held in *Conservancy* that a refusal to initiate rulemaking to designate certain critical habitat under the Endangered Species Act was committed to agency discretion by law. 677 F.3d at 1084–85. We explained that "[t]he decision whether to initiate rulemaking, like the exercise of enforcement discretion, typically involves a complex balancing of factors, such as the agency's priorities and the availability of resources, that the agency is better equipped than courts to undertake." *Id.* at 1084. We also noted that "a refusal to initiate rulemaking, like a nonenforcement decision, does not involve the exercise of coercive power over an individual's liberty or property rights." *Id.* (quotation marks omitted). Given these features, we concluded that the decision not to initiate rulemaking in that case was committed to agency discretion by law. *Id.* at 1085.

Notwithstanding § 701(a)(2), APA review is available when an applicable statute contains a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. In other words, the availability of review depends on whether "Congress has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion." *Id.* at 834. There must be, in short, "law to apply." *Id.*

## B.

Here, the district court correctly concluded that FDE challenges the Forest Service's "refusal to take requested enforcement

action," *Heckler*, 470 U.S. at 831, which is a decision traditionally "regarded as committed to agency discretion," *Lincoln*, 508 U.S. at 191. FDE claims that the Forest Service was prohibited by FLPMA and its own regulations from allowing the state to use and occupy national forest land without a permit or the ability to comply with the statutory and regulatory requirements to obtain one. And they seek to compel the Forest Service to enforce the terms of the original permit governing expiration and either require the state to remove the Canal structures or eject the state and take the necessary actions to restore the Ocklawaha River in accordance with the Record of Decision.

The Forest Service's decision not to enforce the terms of the original permit or to take other enforcement action against the state after the permit expired in 2002 "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler*, 470 U.S. at 831. These factors included whether Forest Service resources were best spent on this violation or another, the likelihood of success if it acted, how to proceed against the violation in a manner that "best fit[] the agency's overall policies," and whether it "ha[d] enough resources to undertake the action at all." *Id.* The agency also had to consider the state's substantial interests in the Canal structures, the structures' unique provenance, and the agency's cooperative relationship with the state on this and other projects, among other things.[2] As in *Heckler*, here,

---

[2] In Florida, the Forest Service manages the Florida Scenic National Trail and three national forests: the Apalachicola National Forest, the Ocala

"[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 832. Plus, also like in *Heckler*, the Forest Service's nonenforcement decision did not involve an agency's "coercive power over an individual's liberty or property rights." *Id.*

For these reasons, the Forest Service's decision not to enforce is "immune from judicial review under § 701(a)(2)" unless Congress "has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33. The same is true of the Forest Service's denial of Kaster and Little's petition for rulemaking, which largely requested enforcement action related to the Canal structures, for essentially the same reasons. *See Conservancy*, 677 F.3d at 1084–85.

## C.

FDE contends that meaningful standards constrained the agency's discretion because a clear "statutory direction" prohibits the "unauthorized occupation and use of national forest lands." So in FDE's view, the Forest Service abused its discretion when it permitted such unauthorized use by the state in relation to the Canal structures.

But "[o]nly if a specific statute somehow limits the agency's discretion to act is there sufficient 'law to apply' as to allow judicial review." *Greenwood Utilities Comm'n v. Hodel*, 764 F.2d 1459,

---

National Forest, and the Osceola National Forest. U.S. Department of Agriculture, Forest Service, *National Forests in Florida*, https://www.fs.usda.gov/florida (last visited August 6, 2021).

1464 (11th Cir. 1985); *see Heckler*, 470 U.S. at 837 (holding that a statute did not provide meaningful standards because it "applie[d] only to a situation where a violation has already been established" and did not "speak[] to the criteria which shall be used by the agency for investigating possible violations of the Act). Statutory language that merely authorizes enforcement or sanctions is not enough. *See Heckler*, 470 U.S. at 835 (statutory provisions authorizing the agency to conduct investigations and stating that any person who violates the statute "shall be imprisoned . . . or fined" did not constrain the agency's enforcement discretion).

In attempting to establish Congressional "intent to circumscribe agency enforcement discretion," *id.* at 830, FDE points us to several statutory provisions which do the following: (a) "authorize[]" the Forest Service "to grant, issue, or renew rights-of-way" on national forest land, 43 U.S.C. § 1761(a); (b) direct the Forest Service, before granting, issuing, or renewing a right-of-way, to require applicants to submit information necessary to make right-of-way determinations, *see id.* § 1761(b)(1); (c) specify that rights-of-way "shall be limited to a reasonable term in light of all circumstances concerning the project," *id.* § 1764(b); (d) direct that the Forest Service "shall grant, issue, or renew a right-of-way . . . only when [it] is satisfied that the applicant has the technical and financial capability to construct the project for which the right-of-way is requested" in accord with the requirements of FLPMA, *id.* § 1764(j); and (e) provide that "no right-of-way" on national forest land "shall be granted, issued, or renewed . . . except under and subject to the provisions, limitations, and conditions" of FLPMA,

*id.* § 1770(a). They also cite regulations that require "individuals or entities" to obtain a special-use permit "[b]efore conducting a special use" on national forest land, 36 C.F.R. § 251.50(a), specify the information that must be submitted in applying for special-use authorization, *id.* § 251.54(b), (d)(3), and demand that "[a]ny violation . . . shall be punished" by a fine or imprisonment, *id.* § 261.1b.

These provisions do not establish meaningful standards for review of the agency's discretion. On the whole, they grant the Forest Service authority to regulate the use and occupancy of national forest land, and they outline procedural and substantive requirements related to the issuance of permits. But they do not establish guidelines "for the agency to follow in exercising its enforcement powers." *Heckler*, 470 U.S. at 832–33. In particular, nothing in the cited statutory or regulatory authority speaks to the Forest Service's authority with regard to uses of national forest land for which special-use authorization has expired. *See id.* at 834, 837; *Hodel*, 764 F.2d at 1464.

FDE claims that the Forest Service was "require[d] . . . to ensure [the state]'s occupancy of use of national forest lands is authorized by a special use permit." Appellant's Br. at 25. But in fact, the Forest Service has tried over the years—in 2010 and 2013, most recently—to do just that, attempting to issue the state new permits and reminding it that the Canal structures required special-use authorization. The state, for its part, though, has declined to sign or be bound by a new permit requiring partial restoration of the Ocklawaha River. FDE does not identify any authority limiting the Forest Service's discretion to deal with that refusal or the state's

16                    Opinion of the Court                    20-12046

continued, unauthorized use of national forest land after its permit expired.

Rather, the only potential sources of guidance relating to expired or unauthorized uses reflect that the Forest Service retains broad discretion to act as it sees fit in these circumstances. Forest Service regulations require the permitholder, upon expiration or termination of the permit, to "remove within a reasonable time the structures and improvements" and restore the land, but they permit an "authorized officer" of the Forest Service to "waive[]" that requirement and to determine what counts as a "reasonable time." *See* 36 C.F.R. § 251.60(i).[3] Likewise, the original special-use permit provided that the permitholder, upon termination of the permit, must "remove within a reasonable time *prescribed by the authorized officer* all structures and improvements, except those owned by the United States, and shall restore the site." Both sources largely outline the responsibilities of the permitholder and, to the

---

[3] 36 C.F.R. § 251.60(i) states,

> Upon revocation or termination of a special use authorization, the holder must remove within a reasonable time the structures and improvements and shall restore the site to a condition satisfactory to the authorized officer, unless the requirement to remove structures or improvements is otherwise waived in writing or in the authorization. If the holder fails to remove the structures or improvements within a reasonable period, as determined by the authorized officer, they shall become the property of the United States, but holder shall remain liable for the costs of removal and site restoration.

extent they concern the agency, do not specify enforcement responsibilities or guidelines and instead grant the agency significant discretion to determine whether and when to remove any existing infrastructure. Neither source provides meaningful standards by which to judge the Forest Service's discretion regarding expired or unauthorized uses.

In sum, the Forest Service's decision not to take enforcement action against the state for its unauthorized use of national forest land—whether by enforcing the terms of the original permit and ordering the state to "remove . . . all structures and improvements . . . and restore the site" or by taking action independently to restore the Ocklawaha River—was "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In the absence of meaningful standards to judge the Forest Service's exercise of discretion in this context, its decisions are not subject to judicial review under the Administrative Procedure Act.

## IV.

For the reasons stated, the district court was correct to conclude that it lacked jurisdiction to review the Forest Service's refusal to take requested enforcement action under 5 U.S.C. § 701(a)(2).[4] Nevertheless, we agree with FDE that the dismissal

---

[4] Because we conclude that the district court lacked jurisdiction under 5 U.S.C. § 701(a)(2), we need not and do not address the Forest Service's arguments that FDE lacked Article III standing, that there was no "final agency action" subject to APA review, or that FDE's claims are barred by the statute of limitations.

for lack of jurisdiction should have been without prejudice, rather than with prejudice. *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice."). We therefore vacate and remand for the limited purpose of allowing the district court to dismiss the case without prejudice. But we affirm the district court in all other respects.

**AFFIRMED IN PART; VACATED AND REMANED IN PART.**