# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 7, 2015

Lyle W. Cayce
Clerk

No. 13-31214

GULF RESTORATION NETWORK; MISSOURI COALITION FOR THE
ENVIRONMENT; IOWA ENVIRONMENTAL COUNCIL; TENNESSEE
CLEAN WATER NETWORK; MINNESOTA CENTER FOR
ENVIRONMENTAL ADVOCACY; SIERRA CLUB; PRAIRIE RIVERS
NETWORK; KENTUCKY WATERWAYS ALLIANCE; ENVIRONMENTAL
LAW & POLICY CENTER; NATURAL RESOURCES DEFENSE COUNCIL,
INCORPORATED; WATERKEEPER ALLIANCE, INCORPORATED,

Plaintiffs - Appellees

v.

GINA McCARTHY, Administrator of the United States Environmental
Protection Agency; UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY,

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Clean Water Act establishes a statutory scheme to protect and improve the quality of the country's waters. The administration of the Act depends on complicated interactions of three actors: the states, with lead responsibility for protecting waters within their borders; the EPA, which steps

in when the state-led efforts are inadequate; and the federal courts, which enforce Congressional mandates against state and federal regulators.

Not every state or EPA action taken under the Act is judicially cognizable; some are committed to agency discretion and are unreviewable. Under the statute, the EPA Administrator is obligated to issue new water quality standards in any case where she "determines that a revised or new standard is necessary to meet the requirements of" the Act. Here, the Administrator denied a petition for rulemaking, declining to make a so-called "necessity determination." The petitioners challenged this decision in federal court. The EPA countered that the denial was an unreviewable discretionary act.

This case poses two questions. First, do we have subject matter jurisdiction to review the EPA's decision not to make a necessity determination. We hold that we do. Second, was the EPA required to make such a determination. We hold that it was not.

I.

A.

Congress passed the Clean Water Act[1] "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[2] The Act bans "the discharge of any pollutant by any person," unless affirmatively allowed by law.[3] In regulating discharge, the Act "anticipates a partnership

---

[1] The "Act" or "CWA."

[2] 33 U.S.C. § 1251(a).

[3] *Id.* § 1311(a). A "pollutant" includes, with certain enumerated exceptions, "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id.* § 1362(6). "Discharge of a pollutant" is defined broadly as "any addition of any pollutant to navigable waters from any point source," *id.* § 1362(12), and "navigable waters," in turn, "means the waters of the United States, including the territorial seas," *id.* § 1362(7). The outer limit of the phrase "waters of the United States" remains fuzzy. *See, e.g., Rapanos*

between the States and the Federal Government,"[4] with both sovereigns sharing regulatory responsibilities for water protection.[5]

One area where both states and the federal government play a role is in the setting and administration of water quality standards. These regulations "define[] the water quality goals of a water body . . . by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses."[6] The states are the primary player in this process; they are "responsible for reviewing, establishing, and revising water quality standards."[7] The federal government plays a secondary role, with important backstop responsibilities. State standards must be submitted to the EPA, the agency tasked with reviewing and approving these standards, to ensure that they are sufficient to "protect the public health or welfare, enhance the quality of water and serve the purposes of this [Act]."[8] If the state's standards do not pass muster, the EPA specifies changes required for approval.[9]

---

v. *United States*, 547 U.S. 715, 733-34 (2006); *id.* at 766-67 (Kennedy, J., concurring in the judgment).

[4] *Arkansas* v. *Oklahoma*, 503 U.S. 91, 101 (1992).

[5] In *New York* v. *United States*, 505 U.S. 144 (1992), the Court termed this regulatory arrangement one of "cooperative federalism," where Congress "offer[s] States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *Id.* at 167 (internal citation omitted).

[6] 40 C.F.R. § 131.2. These standards must "protect public health or welfare, enhance the quality of water and serve the purposes of the [Act]." *Id.* "'Serve the purposes of the Act' (as defined in . . . the Act) means that water quality standards should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water and take into consideration their use and value of public water supplies, propagation of fish, shellfish, and wildlife, recreation in and on the water, and agricultural, industrial, and other purposes including navigation." *Id.*

[7] *Id.* § 131.4(a).

[8] 33 U.S.C. § 1313(c)(2)(A).

[9] *Id.* § 1313(c)(3). The EPA must notify the states of any changes within 90 days after the proposed water quality standards are submitted to it. *Id.*

No. 13-31214

The EPA may also directly set water quality standards through its own regulations under the two circumstances set out in 33 U.S.C. § 1313(c)(4)(A) and (B) ("section 1313(c)(4)").

> (A) if a revised or new water quality standard submitted by such State . . . for such waters is determined by the Administrator not to be consistent with the applicable requirements of this chapter, or
>
> (B) in any case where the Administrator determines that a revised or new standard is <u>necessary</u> to meet the requirements of this chapter.[10]

In other words, in order to regulate pursuant to its section 1313(c)(4)(B) powers, the EPA must make what is called a "necessity determination." If the agency sets water quality standards, it acts through a rulemaking process, and "is subject to the same policies, procedures, analyses, and public participation requirements established for States in these regulations."[11]

B.

This case began when a group of environmental organizations petitioned the EPA[12] to "use its powers [pursuant to section 1313(c)(4)(B)] to control nitrogen and phosphorous pollution" within the Mississippi River Basin and the Northern Gulf of Mexico.

The EPA declined to do so. While the agency agreed that nitrogen and phosphorous pollution "is a significant water quality problem," it did "not believe that the comprehensive use of federal rulemaking authority is the most

---

[10] *Id.* § 1313(c)(4)(A)-(B) (emphasis added).

[11] 40 C.F.R. § 131.22(c).

[12] The organizations included: Gulf Restoration Network, Louisiana Environmental Action Network, Tennessee Clean Water Network, Public Employees for Environmental Responsibility, Kentucky Waterways Alliance, Missouri Coalition for the Environment, Iowa Environmental Council, Prairie Rivers Network, Environmental Law & Policy Center, Midwest Environmental Advocates, Minnesota Center for Environmental Advocacy, Natural Resources Defense Council, and the Sierra Club.

effective or practical means of addressing these concerns at this time." Instead, the EPA said that, because its "long-standing policy, consistent with the CWA, has been that states should develop and adopt standards in the first instance," and in light of the fact that the states had been "quite active" in addressing water pollution issues, it was appropriate to let the states take the primary role in issuing new standards. In denying the petition, the EPA was explicit that it was "not determining that [new standards] are not necessary to meet CWA requirements," but rather was "exercising its discretion to allocate its resources in a manner that supports targeted regional and state activities to accomplish our mutual goals of reducing [nitrogen and phosphorous] pollution and accelerating the development and adoption of state approaches to controlling [nitrogen and phosphorous]."

The petitioners filed suit, positing that the EPA had violated the Administrative Procedure Act[13] and the CWA by declining to make a necessity determination. The EPA moved to dismiss the case on subject matter jurisdiction grounds, arguing that the decision whether to make a necessity determination was a discretionary act that the court lacked authority to review. The parties also cross-moved for summary judgment on the merits.

The district court ruled that it had jurisdiction to review the EPA's decision not to make a necessity determination.[14] It then went one step further. Pursuant to the Supreme Court's decision in *Massachusetts* v. *EPA*,[15] it held that the "EPA could not simply decline to make a necessity determination in response to . . . [the] petition for rulemaking."[16] It remanded

---

[13] 5 U.S.C. § 551 *et seq.* (the "APA").

[14] *Gulf Restoration Network* v. *Jackson*, No. 12-677, 2013 WL 5328547, at *4 (E.D. La. Sept. 20, 2013).

[15] 549 U.S. 497 (2007).

[16] *Gulf Restoration Network*, 2013 WL 5328547, at *6.

No. 13-31214

the case to the agency with orders to conduct a necessity determination.[17]  In doing so, the district court declined to issue specific guidance on "the types of factors that EPA can or cannot consider when actually making the necessity determination."[18]

This timely appeal followed.

## II.

We review de novo the district court's legal conclusions about its subject matter jurisdiction.[19]

## A.

We begin with the elementary principle that "the United States, as sovereign, is immune from suit save as it consents to be sued."[20]  The petitioners have the burden of proving that Congress has consented to suit by affirmatively waiving sovereign immunity in the specific context at issue.[21]  In the Administrative Procedure Act, the statute governing federal agency operations generally, Congress provided a general waiver of sovereign immunity for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."[22]  In light of this language, federal courts must apply a general presumption that they have jurisdiction to review final agency actions.[23]  But this waiver is not absolute, and Congress has provided that the

---

[17] *Id.* at *7.

[18] *Id.*

[19] *Filer* v. *Donley*, 690 F.3d 643, 646 (5th Cir. 2012).

[20] *La. Dep't. of Envtl. Quality* v. *U.S. E.P.A.*, 730 F.3d 446, 448 (5th Cir. 2013) (bracket omitted) (quoting *United States* v. *Sherwood*, 312 U.S. 584, 586 (1941)).

[21] *See id.* at 448-49.

[22] 5 U.S.C. § 702.  The APA waives sovereign immunity for all claims "other than money damages."  *Id.*  Only final agency actions are reviewable under the APA.  *Id.* § 704.

[23] *See, e.g.*, *Sackett* v. *E.P.A.*, 132 S. Ct. 1367, 1373 (2012) ("The APA, we have said, creates a 'presumption favoring judicial review of administrative action,' but as with most presumptions, this one 'may be overcome by inferences of intent drawn from the statutory scheme as a whole.'") (quoting *Block* v. *Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)); *Save*

No. 13-31214

APA – and its concomitant grant of judicial review – does not apply in two circumstances: first, if the "statute[] preclude[s] judicial review," an exception not at issue in this case; and second, if "agency action is committed to agency discretion by law."[24]

In a quartet of cases, the Supreme Court provided two principles that guide our discretion analysis. The first is that the agency discretion clause "is a very narrow exception" to the principle of judicial review of administrative action.[25] It applies only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply."[26] These are situations where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely."[27]

In determining whether Congress has provided a "meaningful standard," the court conducts a "careful examination of the statute on which the claim of agency illegality is based."[28] We look first to the statutory text, paying particular attention to the words Congress has chosen. For example, in *Webster* v. *Doe*, reviewing a statute that allowed the Central Intelligence

---

the Bay, Inc. v. *Adm'r. of E.P.A.*, 556 F.2d 1282, 1293 (5th Cir. 1977) ("A long-standing and strong presumption exists that action taken by a federal agency is reviewable in federal court.").

[24] 5 U.S.C. § 701(a)(1), (2); *see also Webster* v. *Doe*, 486 U.S. 592, 597 (1988) ("The scope of judicial review under [section] 702 . . . is predicated on satisfying the requirements of [section] 701.").

[25] *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano* v. *Sanders*, 430 U.S. 99 (1977).

[26] *Id.* (internal quotation marks and citation omitted).

[27] *Heckler* v. *Chaney*, 470 U.S. 821, 830 (1985). The Court recognized that adopting "[t]his construction avoids conflict with the 'abuse of discretion' standard of review in [section] 706 [of the APA] – if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Id.*

[28] *Webster*, 486 U.S. at 600.

Agency Director to terminate an employee, the Supreme Court highlighted the fact that the statute was drawn so that the Director could fire the employee whenever he "'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests."[29]  This word choice, the Court concluded, "fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review."[30]  The reviewing court must also look at the structure and purpose of the statute.[31]  Turning again to *Webster*, there, the Court found dispositive the fact that the CIA's "efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees."[32]  Judicial review of the termination decision, the Court implicitly concluded, would hinder the agency's effectiveness.

The second agency discretion principle is that different substantive types of agency decisions are subject to different presumptions of reviewability.  In general, agency decisions to affirmatively do something are presumptively reviewable.[33]  The reviewability of agency decisions *not* to do something depends on the type of activity at issue.  For "[r]efusals to take enforcement steps . . . the presumption is that judicial review is not available."[34]  While

---

[29] *Id.*

[30] *Id.*

[31] *See id.* at 600-01.

[32] *Id.* at 601.

[33] *See Abbott Labs.* v. *Gardner*, 387 U.S. 136, 140 (1967), *abrogated on other grounds by Califano* v. *Sanders*, 430 U.S. 99 (1977).

[34] *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985).   A refusal to institute investigative actions is also presumptively unreviewable. *Id.* at 838.  The Court justified this presumption on several grounds, including (1) the agency's need to determine how best to allocate its enforcement resources, *id.* at 831, (2) the fact that "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect," *id.* at 832 (emphasis omitted), and (3) the similarity between "an agency's refusal to institute proceedings" and a

No. 13-31214

Congress can trump this presumption, it must be explicit in doing so.[35] In contrast, an agency's denial of a petition for rulemaking is "susceptible to judicial review" though, as a substantive matter, "such review is 'extremely limited' and 'highly deferential.'"[36]

We pause to resolve one doctrinal uncertainty: whether a denial of a rulemaking petition is *categorically* reviewable, or whether it is merely *presumptively* reviewable? The petitioners urge us to adopt the former construction. We cannot. While the Supreme Court's language in *Massachusetts* v. *EPA* could support such a holding,[37] we conclude that the better reading is that these denials are presumptively reviewable, subject to Congressional language clearly to the contrary, a reading faithful to *Webster*'s exhortation that we determine reviewability only after a "careful examination of the statute."[38] It would accord with readings of *Massachusetts* v. *EPA* by

---

prosecutor's decision "not to indict – a decision which has long been regarded as the special province of the Executive Branch," *id.*

[35] *See id.* at 838.

[36] *Massachusetts* v. *EPA*, 549 U.S. 497, 527-28 (2007) (quoting *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc.* v. *United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)) (internal quotation marks omitted). In distinguishing between refusals to initiate enforcement actions and denials of petitions for rulemaking, the Court concluded that "agency refusals to initiate rulemaking 'are less frequent, more apt to involve legal as opposed to factual analysis, and subject to special formalities, including a public explanation.'" *Id.* at 527 (quoting *Am. Horse Protection Ass'n, Inc.* v. *Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987)). The Court also recognized that these agency decisions "arise out of denials of petitions for rulemaking which (at least in the circumstances here) the affected party had an undoubted procedural right to file in the first instance." *Id.*

[37] *See id.* at 527 (stating, without relevant terms of limitation, that "[r]efusals to promulgate rules are thus susceptible to judicial review"). The Second Circuit has interpreted this language consistent with a categorical right to review. *See, e.g.*, *New York* v. *U.S. Nuclear Regulatory Comm'n*, 589 F.3d 551, 554 (2d Cir. 2009) (holding that "[a]n agency decision to deny a rulemaking petition is subject to judicial review," but cautioning that the standard of review is sufficiently deferential that it "has been said to be so high as to be akin to non-reviewability") (internal citation and quotation marks omitted).

[38] *Webster*, 486 U.S. at 600.

some of our sister circuits,[39] and our own court's long-standing conclusion that there is a "strong presumption," subject to Congressional language, that "action taken by a federal agency is reviewable in federal court."[40]  By "strong" we mean that this presumption is not easily overcome.  Nonetheless, textual limits on agency action remain a prerequisite to our jurisdiction.

## B.

Our inquiry proceeds in two steps: First, we determine whether the agency action is akin to a denial of a rulemaking petition or whether it is properly termed a refusal to engage in enforcement actions.  If it is the former, we employ the presumption of reviewability, if it is the latter, the presumption is nonreviewability.    Second, we look to the statutory provision at issue to see whether Congress has spoken sufficiently clearly as to override the appropriate presumption.

## 1.

We begin by determining whether the EPA's denial of the plaintiffs' request for the adoption of water quality standards is properly classified as a denial of a rulemaking petition or is better termed a refusal to engage in

---

[39] For example, in *Conservancy of Sw. Fla.* v. *U.S. Fish & Wildlife Service*, 677 F.3d 1073 (11th Cir. 2012), the Eleventh Circuit, citing *Massachusetts*, rejected the proposition "that the denial of a petition for rulemaking is always unreviewable, or even presumptively unreviewable." *Id.* at 1085.  Even still, it concluded that "*in context* – against the backdrop of a statutory and regulatory regime that provides absolutely no standards that constrain the Service's discretion – the statute's permissive language makes it all the more apparent that the decision at issue is committed to agency discretion." *Id.* at 1084.  Similarly, in *Preminger* v. *Sec'y of Veterans Affairs*, 632 F.3d 1345, 1351-52 (Fed. Cir. 2011), the Federal Circuit concluded that it had authority to review the denial of a rulemaking petition after using standard statutory interpretation techniques, such as reasoning-by-structure and legislative history, implicitly suggesting its view that there was no categorical right to review divorced from the statutory context.

[40] *See, e.g.*, *RSR Corp.* v. *Donovan*, 747 F.2d 294, 299 n.23 (5th Cir. 1984)  (quoting *Deering Milliken, Inc., Unity Plant* v. *Occupational Safety & Health Review Comm'n*, 630 F.2d 1094, 1099 (5th Cir. 1980)).  The denial of a rulemaking petition is a form of agency action. *See, e.g.*, *Defenders of Wildlife* v. *Gutierrez*, 532 F.3d 913, 918-19 (D.C. Cir. 2008).

enforcement activities.  While we recognize that the line between enforcement and rulemaking is not always clear,[41] we conclude that the EPA's action was akin to a denial of a rulemaking petition and is presumptively reviewable.

In classifying a petition, we look not to the title of the plaintiffs' filing but to the substance of their request.[42]  In their petition, the plaintiffs proposed that:

> EPA should adopt numeric water quality standards for the portion of the ocean protected by the Clean Water Act but outside the jurisdiction of any state and for all water bodies in all states for which numeric water quality standards concerning nitrogen and phosphorous pollution have not yet been established.  In the alternative, EPA should do this for the Northern Gulf of Mexico and for all waters of the United States within the Mississippi River Basin.  At a minimum, EPA should establish water quality standards to control nitrogen and phosphorous pollution in the mainstem of the Mississippi River and the Northern Gulf of Mexico.

On their face, the wide scope of these requests, which would require the adoption of water quality standards across many different states, resembles the type of "broadly applicable . . . policy" that is generally considered a hallmark of rulemaking.[43]  The standards, if adopted, would also "grant rights, impose obligations, or produce other significant effects on private interests," and would "effect a change in existing law or policy," both of which are considered essential features of substantive rules.[44]  Moreover, the mechanism by which the EPA would implement the new water quality standards would be

---

[41] *Cf., e.g., Sec. & Exch. Comm'n* v. *Chenery Corp.*, 332 U.S. 194, 202 (1947) (recognizing that agencies can set broadly applicable standards of policy "either by general rule or by individual order").

[42] *See, e.g., Animal Legal Def. Fund v. U.S. Dep't of Agric.,* No. 2:12-cv-4028, 2013 WL 1191736, at *3 (C.D. Cal. Mar. 22, 2013).

[43] *Crowley Caribbean Transp., Inc.* v. *Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994).

[44] *Am. Hosp. Ass'n* v. *Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (internal citations omitted).

by "prepar[ing] and publish[ing] proposed regulations"[45] pursuant to "the same policies, procedures, analyses, and public participation requirements" that bind the states when they issue their own standards.[46]  This implementation process sounds in rulemaking, not enforcement.

In arguing that the denial of the water quality standards petition is an unreviewable nonenforcement decision, the EPA relies heavily on our decision in *Public Citizen, Inc.* v. *United States Environmental Protection Agency*.[47] There, the petitioner challenged the EPA's decisions not to issue a Notice of Deficiency[48] to the state of Texas for failing to comply with certain regulatory requirements set out in Title V of the Clean Air Act.[49]  We concluded that the decision not to issue a NOD was essentially a "decision not to invoke an enforcement mechanism," and was presumptively unreviewable.[50]  The language of the statute, which stated that the EPA must "issue an NOD when it determines a program is being inadequately administered," was not sufficiently specific to constrain EPA's discretion and overcome the presumption against judicial review.[51]

---

[45] 33 U.S.C. § 1313(c)(4).

[46] 40 C.F.R. § 131.22(c).

[47] 343 F.3d 449 (5th Cir. 2003).

[48] A "NOD."

[49] *See id.* at 453-55.  Title V of the Clean Air Act, the "CAA," "requires major stationary sources of air pollution, such as factories, to receive operating permits incorporating CAA requirements and establishes a procedure for federal authorization of state-run Title V permit programs.  Title V permits do not impose additional requirements on sources but, to facilitate compliance, consolidate all applicable requirements in a single document." *Id.* at 453 (internal citation omitted).  As is relevant here, "[a]fter the EPA approved a State's Title V permit program, the EPA was to maintain an oversight role.  The CAA provides that, whenever the EPA makes a determination that a State is not adequately administering and enforcing its permit program in accordance with Title V, it shall provide a notice of deficiency (NOD) to the State.  If the State does not correct the deficiency within 18 months, it faces sanctions and, eventually, EPA takeover of its program." *Id.* at 454 (internal citations omitted).

[50] *Id.* at 464.

[51] *Id.* at 465; *see also id.* at 464-65.

No. 13-31214

The EPA argues that *Public Citizen* controls.  We disagree.  Given the factual differences between the NOD process under the CAA and the necessity determination mechanism under the CWA, our earlier decision is inapposite. First, a NOD determination is explicitly premised on the determination by the EPA that the state in question is not "adequately administering and enforcing" its Title V permitting program.[52]  Agency action, then, depends on a conclusion that the state is failing to meet its statutory requirements, a finding that fits comfortably within the ambit of an enforcement action.[53]  By contrast, section 1313(c)(4)(B) of the CWA requires the EPA to issue new water quality standards "in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of this chapter."[54]  Under a plain reading of this provision, the state need not do anything wrong for the EPA to take action.  Further buttressing that conclusion is the immediately preceding clause, section 1313(c)(4)(A), requires the EPA to issue a new standard "if a . . . water quality standard submitted by such State . . . for such waters is determined by the Administrator *not to be consistent* with the applicable requirements of this chapter."[55]  Here, the EPA must determine that the state's standards do not meet the federal requirements.  An action to correct that inadequacy could be termed an enforcement mechanism.  But the two sections are set off by the disjunctive "or," which suggests that section 1313(c)(4)(B) does not require a finding of inadequacy, a feature more in line with rulemaking.

---

[52] 42 U.S.C. § 7661a(i)(2).

[53] Moreover, the CAA subsection setting out the NOD process is titled "[a]dministration and enforcement."  42 U.S.C. § 7661a(i).  While the title of a statutory section is not part of the law itself, and so does not control, it may be used as a guide to determine the meaning of a provision.  *See, e.g.*, *Griffin* v. *Steeltek, Inc.*, 160 F.3d 591, 594 n.4 (10th Cir. 1998).  Here, the title suggests that the NOD provision is an enforcement tool.

[54] 33 U.S.C. § 1313(c)(4)(B).

[55] *Id.* § 1313(c)(4)(A) (emphasis added).

Second, the consequences of noncompliance with the EPA's actions differ between these regulatory processes. After issuing a NOD, the EPA "is authorized to sanction the state if the deficiencies are not corrected within eighteen months . . . . Possible sanctions include the loss of federal highway funds and the application of strict emissions offset requirements for new sources in certain areas within the state."[56] These sanctions are essentially punitive in nature, a marking of enforcement. By contrast, the CWA authorizes no financial consequences for noncompliance.

Finally, the procedures by which the agency actions occur are different. With the CAA, after making a NOD determination, the agency must "provide notice to the State" before imposing sanctions,[57] akin to a due process requirement prior to punishment. With a CWA water quality standard, by contrast, the EPA must "promptly prepare and publish proposed regulations," without any explicit requirement that it inform the affected states.[58] This general notification process is a feature characteristically found in rulemaking.[59] We conclude that the EPA has denied a rulemaking petition, an action presumptively subject to judicial review.

2.

With this presumption in place, we turn to whether section 1313(c)(4)(B) provides "no meaningful" or "no substantive" standards to apply.[60] We hold

---

[56] *Ohio Pub. Interest Research Grp., Inc.* v. *Whitman*, 386 F.3d 792, 794 (6th Cir. 2004) (internal citation omitted) (citing 42 U.S.C. §§ 7661a(i)(1)-(2), 7509(b)(1)-(2)).

[57] 42 U.S.C. § 7661a(i)(1). While the statutory language could have been more explicit, it appears that notice to the state must occur before sanctions can be imposed. *See Legal Envtl. Assistance Found.* v. *U.S. E.P.A.*, 400 F.3d 1278, 1280 (11th Cir. 2005) ("The first step in the enforcement process is the issuance of a notice of deficiency ('NOD') to a state.").

[58] 33 U.S.C. § 1313(c)(4).

[59] *See, e.g.*, 5 U.S.C. § 553(b) ("General notice of proposed rule making shall be published in the Federal Register.").

[60] *Webster* v. *Doe*, 486 U.S. 592, 600 (1988) (quoting, first, *Heckler* v. *Chaney*, 470 U.S. 821, 830 (1985)).

No. 13-31214

that Congress has given sufficient guidance for judicial review of the agency's actions under the statute, and we have subject matter jurisdiction.

a.

An important qualification: our task is not to determine whether there are adequate statutory standards to judge the EPA's decision that new water quality standards are or are not necessary.  Rather, we must decide whether Congress has placed sufficient guideposts around the EPA's *prerequisite* decision not to make a necessity determination.[61]  These two inquiries are related, however, and *Massachusetts* v. *EPA* provides insight as to how.

There, the Court clarified the type of permissible response the EPA could give after receiving a petition asking it to make a "judgment" that greenhouse gases "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."[62]  The Court held that the EPA was not obligated to make a judgment that such gases do or do not contribute to climate change *if* "it provides some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether they do."[63]  That explanation, in turn, must be "ground[ed] . . . in the statute."[64]  The Court was not precise in specifying how tight the connection must be between the underlying statute and the agency decision to decline to exercise its discretion to make a prerequisite determination that it would or would not take action under that statute.  It did, however, reject as inadequate several explanations posited by the EPA, which provide us some useful guidance.

---

[61] Said differently, we are looking at the EPA's decision not to make a decision.

[62] *Massachusetts* v. *EPA,* 549 U.S. 497, 532-33 (2007) (citing 42 U.S.C. § 7521(a)(1)) (brackets omitted).

[63] *Id.* at 533.

[64] *Id.* at 535; *see also id.* at 533 ("But once EPA has responded to a petition for rulemaking, its reasons for action or inaction must conform to the authorizing statute.").

15

No. 13-31214

First, the Court rejected the EPA's arguments that it could decline to make a determination based on certain "policy judgments," which included (1) the presence of "voluntary Executive Branch programs [that] already provide an effective response to the threat of global warming," (2) the potential impact of a determination on the President's negotiations with foreign powers, and (3) the fact that regulating automobiles would be "an inefficient, piecemeal approach" to climate change.[65] Whatever the merits of these arguments, the Court concluded, "they ha[d] nothing to do with whether greenhouse gas emissions contribute to climate change."[66] Second, the Court recognized that scientific uncertainty could be an acceptable explanation for refusing to make a threshold judgment.[67] If the agency wanted to rely on this explanation, however, it had to be explicit about why it lacked "sufficient information . . . to make an endangerment finding" – it could not merely "not[e] the uncertainty surrounding various features of climate change."[68] These examples suggest that the court was looking for a close and specific linkage between the decision not to make a threshold determination and the statutory provision setting out the underlying choice. The agency cannot rely on alternative policy grounds, even if reasonable, if those explanations do not find clear textual support. Nor can it resort to general claims of scientific uncertainty – if it justifies its refusal to make a threshold determination on that basis, it must be explicit about what uncertainty is present.

Justice Scalia's dissent comports with this understanding. He criticized the majority for its narrow definition of an acceptable "reasonable

---

[65] *Id.* at 533 (internal citations omitted).

[66] *Id.*

[67] *See id.* at 534.

[68] *Id.*; *see also id.* ("If the scientific uncertainty is so profound that it precludes EPA from making a reasoned judgment as to whether greenhouse gases contribute to global warming, EPA must say so.").

explanation." He focused on the distinction between the reasons the agency can rely on when it makes such a judgment about air pollutants, and those it can depend on when refusing to make a judgment – and concluded that the latter category was much broader:

> When the Administrator makes a judgment whether to regulate greenhouse gases, that judgment must relate to whether they are air pollutants that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." But the statute says nothing at all about the reasons for which the Administrator may defer making a judgment—the permissible reasons for deciding not to grapple with the issue at the present time. Thus, the various "policy" rationales that the Court criticizes are not "divorced from the statutory text," except in the sense that the statutory text is silent, as texts are often silent about permissible reasons for the exercise of agency discretion. The reasons EPA gave are surely considerations executive agencies regularly take into account (and ought to take into account) when deciding whether to consider entering a new field: the impact such entry would have on other Executive Branch programs and on foreign policy. There is no basis in law for the Court's imposed limitation.[69]

Justice Scalia, then, would have allowed the agency to put forward reasonable explanations for not making threshold determinations that are not inconsistent with the statute, rather than insisting upon an explicit textual connection. That the majority rejected this reading suggests a tighter linkage is required.[70]

---

[69] *Id.* at 552 (Scalia, J., dissenting) (quoting 42 U.S.C. § 7521(a)(1)) (emphasis omitted) (internal citations omitted).

[70] In *WildEarth Guardians* v. *United States Environmental Protection Agency*, 751 F.3d 649 (D.C. Cir. 2014), the D.C. Circuit upheld the EPA's denial of a rulemaking petition which declined to make a determination as to whether emissions from coal mines contribute to air pollution. *Id.* at 652, 656. It justified this decision on the basis of resource constraints that required it to make priorities about what regulatory priorities it focused on. *Id.* at 652-53. The court affirmed these reasons under *Massachusetts* v. *EPA*, concluding that they were "consistent with the statutory objective." *Id.* at 655. This decision could be read to require a less searching linkage than the *Massachusetts* v. *EPA* majority applied. However, even here, the *WildEarth* court was able to point to specific statutory language, *see id.*, which sets the

## No. 13-31214

Informed by this precedent, we conclude that the EPA's reasons for declining to make a necessity determination must be rooted in the words of section 1313(c)(4)(B). And because the agency can only justify its decision not to make a necessity determination based on factors identified in the language of the statute, we look to those words to decide whether the statute is sufficiently specific to allow judicial review.

b.

We turn back to the Clean Water Act and hold that the EPA has not overcome the statutory presumption that we have subject matter jurisdiction to review its denial of the plaintiffs' rulemaking petition.

We begin with the text. The EPA is required to publish new water quality standards "in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of [chapter 26 of title 33 of the United States Code.]"[71] Those statutory requirements are further defined in the statute; for example, section 1313(c)(2)(A) defines the necessary features of a water quality standard:

> Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation.[72]

---

decision apart from Justice Scalia's dissent, which relied primarily on statutory silence, which could then be filled by the agency under *Chevron* v. *National Resources Defense Council*, 467 U.S. 837 (1984). *Massachusetts*, 549 U.S. at 552-53 (Scalia, J., dissenting).

[71] 33 U.S.C. § 1313(c)(4)(B). Title 33, Chapter 26 of the United States Code codifies the Clean Water Act. *See id.* § 1251 *et seq.*

[72] *Id.* § 1313(c)(2)(A).

18

No. 13-31214

The EPA expanded upon these requirements in regulations issued pursuant to the CWA.[73] While broadly drawn, these requirements provide guidance for the types of considerations the EPA must take into account in deciding the necessity of regulation. And, by *Massachusetts* v. *EPA*, these are the same factors that must be considered when the EPA declines to make a necessity determination. As general factors are still reviewable factors, we cannot conclude that there are *no* standards to judge the EPA's decision to elect not to make a necessity determination.[74]

The structure of section 1313(c)(4)(B), which employs mandatory language, also suggests reviewability. There, Congress required regulation if the EPA Administrator makes a "determin[ation]" that new standards are necessary. In section 7521(a)(1), found reviewable by *Massachusetts* v. *EPA*, the EPA Administrator had to regulate if she made a "judgment" that the emission of greenhouse gases by motor vehicles causes or contributes to air pollution.[75] Both statutes are structured the same way: the agency has a mandatory obligation to take regulatory action if it makes a judgment (or determination) that regulation is required. This is in contrast to provisions

---

[73] *See* 40 C.F.R. § 131.2 ("A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses. States adopt water quality standards to protect public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act (the Act). 'Serve the purposes of the Act' (as defined in sections 101(a)(2) and 303(c) of the Act) means that water quality standards should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water and take into consideration their use and value of public water supplies, propagation of fish, shellfish, and wildlife, recreation in and on the water, and agricultural, industrial, and other purposes including navigation.").

[74] *Cf. Conservancy of Sw. Fla.* v. *U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1082 (11th Cir. 2012) ("We have held before that the absence of *any* applicable legal standard that limits the agency's discretion precludes APA review.") (emphasis added).

[75] 549 U.S. 497, 532-33 (2007) (citing 42 U.S.C. § 7521(a)(1)).

that other courts have found unreviewable that use exclusively discretionary language, stating only that the agency "may" regulate, but need not do so.[76]

Nor does the overall structure of the Clean Water Act call this conclusion into question. Both parties emphasize the fact that the CWA is a cooperative federalism regime. The EPA argues that the CWA is a "carefully crafted scheme of cooperative federalism" that would be "placed at risk" if the courts were "to second-guess every EPA decision not to interfere with duly promulgated State water quality standards." The petitioners, in turn, focus on the backstop role the federal government plays in setting standards when state action is not enough, and argue that the Congressional intent of maintaining federal involvement would be frustrated if there was no judicial review. While both positions have merit, by the light of the required presumption of reviewability, we conclude that petitioners' argument carries more weight. This statutory scheme is defined by federal action: as Justice White noted in a different context, even though the CWA is a state-federal partnership, "the Federal Government maintains an extraordinary level of involvement" in administering the act.[77]

Finally, the subject matter of the CWA is also consistent with judicial review. Federal courts regularly hear cases addressing environmental regulations, including those implicating federalism issues.[78] This case does

---

[76] *See, e.g.*, *Conservancy of Sw. Fla.*, 677 F.3d at 1083 (holding that the language in a statutory provision that stated that "[c]ritical habitat may be established for those species now listed as threatened or endangered" was unreviewable) (quoting 16 U.S.C. § 1532(5)(B)).

[77] *U.S. Dep't of Energy* v. *Ohio*, 503 U.S. 607, 634 (1992) (White, J., concurring in part and dissenting in part); *see also id.* ("EPA reviews state water quality standards. It retains authority to object to the issuance of particular permits, to monitor the state program for continuing compliance with federal directives, and even to enforce the terms of state permits when the State has not instituted enforcement proceedings.") (internal citations omitted).

[78] *See generally, e.g.*, *E.P.A.* v. *EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014) (federal regulation of interstate pollution); *Massachusetts*, 549 U.S. 497 (federal regulation of greenhouse gases); *Rapanos* v. *United States*, 547 U.S. 715 (2006) (federal regulation of navigable waters and wetlands).

not bring the sensitive national security issues of the genus that the Supreme Court has held supports a determination that the actions taken are not judicially cognizable.[79]   Indeed, federal courts have reviewed or held reviewable EPA decisions not to propose new or revised water quality standards under section 1313(c)(4)(B).[80]   While these reviews have been deferential, by reviewing at all, those courts implicitly concluded that they had subject matter jurisdiction.[81]

Given the text, structure, and subject matter of section 1313(c)(4), we hold that the agency has not overcome the presumption in favor of reviewability of agency action, and that we have jurisdiction to review the EPA's decision not to make a necessity determination.

### III.

We now turn to whether the EPA had discretion to decide not to make a necessity determination.  The district court concluded that the agency lacked such authority.[82]  We do not agree.

In *Massachusetts* v. *EPA*, the Court is explicit that the EPA could avoid making a threshold determination (in that case, that greenhouse gases do not contribute to climate change) "if it provides some reasonable explanation as to

---

[79] *See, e.g.*, *Webster* v. *Doe*, 486 U.S. 592, 600-01 (1988).

[80] *See, e.g.*, *Envtl. Def. Fund, Inc.* v. *Costle*, 657 F.2d 275, 293-94 (D.C. Cir. 1981) (rejecting challenge which argued that EPA had unreasonably "fail[ed] to propose revised or new water quality standard,"); *Nat'l Wildlife Fed'n* v. *Browner*, Civ. A. No. 95-1811, 1996 WL 601451, at *6 (D.D.C. Oct. 11, 1996) ("[S]uch a discretionary decision is not committed to the agency as a matter of law, and EPA's failure to exercise its discretion under 33 U.S.C. § 1313(c)(4)(B) could be subject to a proper challenge under the APA."), *aff'd* 127 F.3d 1126 (D.C. Cir. 1997).

[81] *But see Mo. Coalition for the Env't Found.* v. *Jackson*, 853 F. Supp. 2d 903, 910-12 (W.D. Mo. 2012) (holding that the decision not to exercise discretionary authority under section 1313(c)(4)(B) is committed to agency discretion by law).

[82] *See Gulf Restoration Network* v. *Jackson*, No. 12-677, 2013 WL 5328547, at *6 (E.D. La. Sept. 20, 2013) (reading *Massachusetts* v. *EPA* to hold that "EPA lacks the discretion to simply decline to make the threshold determination in response to a rulemaking petition even where the statutory text does not explicitly require it to do so.").

why it cannot or will not exercise its discretion to determine whether they do."[83]  In dissent, Justice Scalia explicitly recognized that the majority held that the EPA could decline to make a prerequisite determination:

> [T]he Court invents a multiple-choice question that the EPA Administrator must answer when a petition for rulemaking is filed. The Administrator must exercise his judgment in one of three ways: (a) by concluding that the pollutant does cause, or contribute to, air pollution that endangers public welfare (in which case EPA is required to regulate); (b) by concluding that the pollutant does not cause, or contribute to, air pollution that endangers public welfare (in which case EPA is not required to regulate); or (c) by "provid[ing] some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether" greenhouse gases endanger public welfare, (in which case EPA is not required to regulate).[84]

We recognize that the language of the CWA and that of the CAA is not identical.  However, the CAA section at issue in *Massachusetts* and the CWA provision at issue here have the same structure: (1) a mandatory clause requiring the EPA Administrator to issue regulations on a certain topic, (2) if she makes a specific threshold determination, using her bounded discretion, (3) that a substantive standard has been satisfied.[85]  We hold that the *Massachusetts* v. *EPA* "reasonable explanation" rule applies to section

---

[83] *Massachusetts*, 549 U.S. at 533.  That explanation must be grounded in the statute. *See id.* at 535 ("We hold only that EPA must ground its reasons for action or inaction in the statute.").

[84] *Id.* at 550 (Scalia, J., dissenting) (emphasis omitted) (quoting *id.* at 533 (majority op.)).

[85] *Compare* 42 U.S.C. § 7521(a)(1) ("The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.") (CAA), *with* 33 U.S.C. § 1313(c)(4)(B) ("The Administrator shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved . . . in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of this chapter.") (CWA).

1313(c)(4)(B), and that the EPA may decline to make a necessity determination if it provides an adequate explanation, grounded in the statute, for why it has elected not to do so.[86]

The district court ordered the "EPA to conduct a necessity determination in response to Plaintiffs' rulemaking petition."[87]  Because the agency had the option of declining to make a necessity determination, this order was error. We remand this case to the district court to decide in the first instance whether the EPA's explanation for why it declined to make a necessity determination was legally sufficient.

In doing so, the district court must bear in mind several principles.  First, the court applies the arbitrary and capricious standard of review set out in the APA.[88]  "As applied to refusals to initiate rulemakings, this standard is 'at the

---

[86] In so holding, we join other courts who have applied *Massachusetts* to similarly structured statutes and concluded that the agency is not required to make a predicate threshold finding.  *See, e.g.*, *WildEarth Guardians* v. *U.S. E.P.A.*, 751 F.3d 649, 655 (D.C. Cir. 2014) (holding that agency had discretion to decide when to add categories of stationary sources "to the list of regulated air pollutants"); *Natural Res. Def. Council v. U.S. Food & Drug Admin.*, 760 F.3d 151, 191 (2d Cir. 2014) (Katzmann, C.J., dissenting) ("The statute construed in *Massachusetts v. EPA* was just like the statute at issue here – part discretionary (as to the agency's 'judgment'), and part mandatory (as to the ensuing regulation).  Indeed, the Court recognized in its opinion that the EPA was not necessarily required to take any action beyond adequately responding to the citizen petition.").  *But see Ctr. for Biological Diversity* v. *U.S. E.P.A.*, 794 F. Supp. 2d 151, 162 (D.D.C. 2011) (holding that the structure of a provision of the CAA "strongly suggest that Congress intended the predicate endangerment finding to be a compulsory step").

[87] *Gulf Restoration Network*, 2013 WL 5328547, at *7.

[88] *See* 5 U.S.C. § 706(2)(A) (requiring a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *see also New York* v. *U.S. Nuclear Regulatory Comm'n*, 589 F.3d 551, 554 (2d Cir. 2009) (applying arbitrary and capricious standard to denial of rulemaking petition); *EMR Network* v. *F.C.C.*, 391 F.3d 269, 272-73 (D.C. Cir. 2004) (same).  In *Massachusetts* v. *EPA*, the Court applied the arbitrary and capricious standard found in the CAA's judicial review provision to the agency's refusal to make a threshold determination.  549 U.S. at 534 (citing 42 U.S.C. § 7607).  This provision is subject to the same standard of review as the APA.  *Catawba Cnty, N.C.* v. *E.P.A.*, 571 F.3d 20, 41 (D.C. Cir. 2009).

high end of the range' of deference,"[89] and "such review is 'extremely limited' and 'highly deferential.'"[90]  Second, in deciding whether the EPA appropriately declined to make a necessity decision, the district court's review is limited to determining whether the EPA has "provide[d] some reasonable explanation as to why it cannot or will not exercise its discretion" to make a necessity determination.[91]  That explanation must be grounded in the statute.[92]

In light of this highly deferential standard of review, the agency's burden is slight.  That is particularly true when the statute is as broadly written as section 1313(c)(4)(B).  Moreover, when a statute sets out competing considerations, agencies are generally given discretion to choose how to best give effect to those mandates.[93]  Nonetheless, we leave it to the capable hands of the district court to determine in the first instance the propriety of the EPA's actions.

IV.

We VACATE the order of the district court requiring the EPA to make a necessity determination and REMAND this case for proceedings consistent with this opinion.

---

[89] *EMR Network*, 391 F.3d at 273 (quoting *Am. Horse Protection Ass'n, Inc.* v. *Lyng*, 812 F.2d 1, 4-5 (D.C. Cir. 1987)); *see also Preminger* v. *Sec'y of Veterans Affairs*, 632 F.3d 1345, 1353 (Fed. Cir. 2011) (same); *Int'l Union* v. *Chao*, 361 F.3d 249, 254-55 (3d Cir. 2004) (same).

[90] *Massachusetts*, 549 U.S. at 527-28 (quoting *Nat'l Customs Brokers & Forwarders Ass'n. of Am.* v. *United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)). *National Customs Brokers*, favorably cited by *Massachusetts* v. *EPA*, and written by then-Judge Ginsburg, held that the court "will overturn an agency's decision not to initiate a rulemaking only for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency." *Nat'l Customs Brokers*, 883 F.2d at 96-97.

[91] *Massachusetts*, 549 U.S. at 533.

[92] *Id.* at 535.

[93] *See WildEarth Guardians* v. *U.S. E.P.A.*, 751 F.3d 649, 654-55 (D.C. Cir. 2014) (interpreting CAA provision to "afford[] agency officials discretion to prioritize sources that are the most significant threats to public health to ensure effective administration of the agency's regulatory agenda").